# In the United States Court of Federal Claims

BID PROTEST
No. 15-1527C
Filed Under Seal: January 13, 2016
Reissued for Publication: April 19, 2016[*]

|   |   |   |
|---|---|---|
| WALLACE ASSET MANAGEMENT, LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | The Tucker Act, 28 U.S.C. § 1491(b)(1); 28 U.S.C. § 1491(b)(2); Post-Award Bid |
| THE UNITED STATES, | ) ) | Protest; Motion for a Temporary Restraining Order; Motion for a |
| Defendant, | ) ) | Preliminary Injunction; RCFC 65. |
| v. | ) ) | |
| BLM COMPANIES, LLC, | ) ) | |
| Defendant-Intervenor. | ) ) | |

*James Stephen DelSordo*, Counsel of Record, Argus Legal, LLC, Manassas, VA, for plaintiff.

*Agatha Koprowski*, Trial Attorney, *Douglas Mickle, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

*Douglas Paul Hibshman*, Counsel of Record, Fox Rothschild, LLP, Washington, DC, for defendant-intervenor.

---

[*] This Memorandum Opinion and Order was originally filed under seal on January 13, 2016 (docket entry 20), pursuant to the protective order entered in this action on December 17, 2015 (docket entry 11). The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order. The parties filed a joint status report on February 5, 2016 (docket entry 24) proposing certain redactions which the Court has adopted. Accordingly, the Court is reissuing its Opinion and Order dated January 13, 2016, with the agreed redactions indicated by three consecutive asterisks within brackets ([***]).

# MEMORANDUM OPINION AND ORDER
# DENYING PLAINTIFF'S MOTIONS FOR A TEMPORARY
# RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION

GRIGGSBY, Judge

## I. INTRODUCTION

Plaintiff, Wallace Asset Management, LLC, brought this post-award bid protest matter challenging the decision of the United States Department of Housing and Urban Development to award five contracts to provide field service management services to BLM Companies, LLC. Wallace has filed motions for a temporary restraining order and for a preliminary injunction requesting that the Court enjoin BLM from commencing performance under the contracts. For the reasons set forth below, the Court **DENIES** Wallace's motions for a temporary restraining order and for a preliminary injunction.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Factual Background

The relevant facts in this case are not in dispute. Plaintiff, Wallace Asset Management, LLC ("Wallace"), is a disappointed offeror in connection with the award of several government contracts to provide field service management ("FSM") services for the United States Department of Housing and Urban Development ("HUD"). *See generally* Compl. Wallace has brought this bid protest action challenging HUD's August 27, 2015 and September 28, 2015 decisions to award these contracts to BLM Companies, LLC ("BLM"). A374-75. In this action, Wallace seeks to, among other things, enjoin BLM from commencing performance under the subject contracts until this matter is resolved. *See* Pl. Mot. for TRO at 1-2; Pl. Mot. at 2.

---

[1] The facts recited in this Memorandum Opinion and Order are taken from plaintiff's complaint (Compl. at __"); plaintiff's motion for a temporary restraining order ("Pl. Mot. for TRO at _"); plaintiff's motion for a preliminary injunction ("Pl. Mot. at __"); plaintiff's memorandum in support of its motion for a preliminary injunction ("Pl. Mem. at __"); defendant's response and opposition to plaintiff's motion for a temporary restraining order ("Def. Resp. at __"); defendant's appendix to its response ("A__" or "Def. Appendix"); and plaintiff's reply in support of its motion for a temporary restraining order ("Pl. Reply at __"). Except where otherwise noted, the facts cited herein are undisputed.

### 1.     The Request For Proposals

The Federal Housing Administration ("FHA"), a division of HUD, "insures approved lenders against the risk of loss on mortgages obtained with FHA financing."  A99.  If there is a default on a mortgage, the mortgage lender may reclaim the property, file a claim for insurance benefits, and convey the property to HUD.  *Id*.  HUD manages the conveyed property for eventual sale.  *Id*.  HUD contracts for the maintenance of these properties *via* FSM contracts.  *Id*.  Contractors performing FSM contracts "provide property maintenance and preservation services," including "inspecting the property, securing the property, performing cosmetic enhancements/repairs, and providing on-going maintenance."  A102.

On May 22, 2014, HUD issued Request for Proposals No. DU204SA-13-R-0004 ("RFP") to provide FSM services in eight different geographic areas located across the United States.  A72; A84; A258.  Under the terms of the RFP, HUD would award one indefinite-delivery, indefinite-quantity contract, consisting of one base year and four option years, in each of the eight geographic areas.  A72; A87; A396.

Wallace and BLM both submitted proposals for FSM contracts in five of the eight geographic areas covered by the RFP.  A284; A292; A320; A325; A334.  Namely, Wallace and BLM submitted proposals in area 1D, encompassing Utah, Colorado, New Mexico, and Northern Texas; area 1P, encompassing Michigan; area 3P, encompassing Maine, Vermont, New York, New Hampshire, Rhode Island, New Jersey, Massachusetts, and Connecticut; area 4P encompassing Ohio; and area 5P, encompassing West Virginia, Virginia, Delaware, Maryland, and the District of Columbia.  *Id*.; A373-75.  In addition, BLM submitted proposals for FSM contracts in the remaining three areas not at issue in this case.  *See* A286; A288; A290.  Several other contractors also submitted proposals in response to the RFP.  A284; A286; A288; A290; A292; A320; A325; A334.

The RFP provided that the government would conduct the solicitation using a Performance Price Trade-Off ("PPT") methodology.  A248.  Under the RFP, technical approach would be evaluated on a pass/fail basis.  *Id*.  If an offeror's proposal was deemed technically acceptable, HUD would then evaluate offerors' past/present performance and price.  *Id*.  The RFP provided that the past/present performance and price factors were of equal value.  *Id*.

### a. Technical Approach

With respect to the technical approach factor under the RFP, HUD rated the proposals submitted by Wallace and BLM as technically acceptable. A292; A295; A320; A325; A334. And so, both proposals advanced to the next round of the evaluation. *Id.*

### b. Past/Present Performance

With respect to the past/present performance factor, the RFP required that offerors submit information about their past or present performance on other contracts for field management services. A11-12; A374. Alternatively, in the event that an offeror did not have any relevant past contract experience, the RFP provided that:

> Offerors or joint venture partners that either have no prior contracts or do not possess relevant corporate Past/Present Performance, but have key personnel with relevant past performance while employed by another company(s), may demonstrate the performance of such key personnel by submitting the names, letter of commitment and summary sheets for three of the most recent and relevant contracts under which such key personnel performed the same role currently being proposed on the instant acquisition.

A12.

Wallace addressed the past/present performance factor in each of its proposals by identifying three past efforts related to FSM services and also proposing at least five key personnel who worked for other FSM contractors. A341-3; A367-70. HUD determined that the three past efforts identified by Wallace were not relevant and, thus, rated Wallace as neutral/unknown confidence. A296; A317; A321; A326; A335; A341. Specifically, HUD determined that the first effort was not relevant because Wallace failed to provide the volume of properties that Wallace managed under the contract. A341; A367; A369. HUD also found that the two other efforts cited by Wallace "did not meet the scope of work requirement of the solicitation." A367; A369. In addition, HUD determined that Wallace had failed to specify which key personnel with relevant experience would be committed to a particular contract area. A380. And so, HUD concluded that the past/present performance of the five key personnel was also not relevant and rated Wallace's proposal with respect to this factor as neutral/unknown confidence. A296; A317; A321; A326; A335; A341; A380.

BLM addressed the past/present performance factor in its proposal by submitting three past subcontracting efforts. A264-66. For each of the five areas at issue, HUD determined BLM had "successfully performed most of the scope of this solicitation through 3 efforts as a subcontractor on

4

3 FSM contracts with superior ratings throughout the service period in the areas of Quality of Product, Schedule, Cost, Business Relations, and Management of Key Personnel." *Id*. And so, HUD rated BLM's proposal with respect to the past/present performance factor as good/significant confidence. A296; A316; A321; A326; A335.

### c. Price

Lastly, with respect to the price factor, Wallace's proposed price was higher than BLM's proposed price for each of the five FSM contracts in dispute. A295; A292; A320; A325; A334. For area 1D, BLM's proposed price was $112,969,979.00, whereas Wallace's proposed price was $192,453,895.00. A295. For area 1P, BLM's proposed price was $73,262,899.00, and Wallace's proposed price was $86,762,390.00. A334. For area 3P, BLM's proposed price was $46,622,975.00. A292; A316. Wallace's proposed price was $58,525,100.00. *Id*. For area 4P, BLM's proposed price was $61,375,629.00, whereas Wallace's proposed price was $91,030,480.00. A320-21. For area 5P, BLM's proposed price was $83,733,750.00, and Wallace's proposed price was $124,707,630.00. A325.

In addition, for the contracts for areas 1D, 3P, 4P, and 5P, at least one other offeror–other than BLM–had a technically acceptable, lower-priced proposal than Wallace, and received a good/significant confidence rating for the past/present performance factor. A292; A295-96; A316-17; A320-21; A325-26; A334-35.

### 2. Award Of The Contracts

On August 6, 2015, HUD's Source Selection Authority issued Source Selection Decisions for the contracts for areas 1D and 3P, recommending that HUD award these contracts to BLM. A294-98; A315-18. In its Source Selection Decision for the contract for area 1D, HUD's Source Selection Decision provides that:

> The TEP [Technical Evaluation Panel] is proposing award to candidate, BLM Companies, LLC, with the highest confidence rating and the second lowest contract cost of $112,969,979.00. BLM Companies, LLC's Present/Past Performance involved the same scope, magnitude and complexity of work required in the solicitation resulting in a rating of Good/Significant Confidence. BLM Companies, LLC's overall quality of services, scheduling, cost, business relations and management of key personnel was rated excellent. BLM Companies, LLC's Technical Approach was rated Acceptable, which illustrates their abilities to manage, maintain, and/or preserve HUD-owned properties. The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating is worth a higher price than the

5

unknown confidence of [***] at a lower price. There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price differences is not worth the risk of awarding to [***] where no confidence rating could be reasonably assigned.

A297. With respect to the contract for area 3P, HUD's Source Selection Decision provides that:

> The TEP is proposing award to candidate, BLM Companies, LLC, with an Acceptable Technical Approach and Good/Significant Confidence rating and the third lowest contract cost of acceptable offerors at a cost of $46,622,975. BLM Companies, LLC's overall past performance in the quality of service, scheduling, cost, business relations and management of key personnel is rated good. BLM Companies, LLC's performance involved the scope, magnitude and complexity required in the solicitation and based on this opinion, the offeror was rated "Good/Significant Confidence" overall. The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating, is worth a higher price than the unknown confidence of [***] and [***] at a lower price. There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price difference is not worth the risk of awarding to [***] or [***], where no confidence rating could be reasonably assigned.

A317.

On August 26, 2015, HUD's Source Selection Authority issued Source Selection Decisions for the contracts for areas 4P and 5P, recommending that HUD award these contracts to BLM. A319-23; A324-28. With respect to the contract for area 4P, HUD's Source Selection Decision provides that:

> The TEP is proposing award to candidate, BLM Companies, LLC, with an Acceptable Technical Approach and Good/Significant Confidence rating and at a cost of $$61,375,629.00 [sic]. BLM Companies, LLC's overall past performance in the quality of service, scheduling, cost, business relations and management of key personnel is rated good. BLM Companies, LLC's performance involved the scope, magnitude and complexity required in the solicitation and based on this opinion, the offeror was rated "Good/Significant Confidence" overall. The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating, is worth a higher price than the unknown confidence of [***] at a lower price. There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price difference is not worth the risk of awarding to [***] where no confidence rating could be reasonably assigned.

A322. With respect to the contract for area 5P, HUD's Source Selection Decision provides that:

> The TEP is proposing award to candidate, BLM Companies, LLC, with an Acceptable Technical Approach and Good/Significant Confidence rating and at a cost of $83,733,750.00. BLM Companies, LLC's overall past performance in the quality of service, scheduling, cost, business relations and management of key personnel is rated good. BLM Companies, LLC's performance involved the scope, magnitude and complexity required in the solicitation and based on this opinion, the offeror was rated "Good/Significant Confidence" overall. The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating, is worth a higher price than the unknown confidence of [***] at a lower price. There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price difference is not worth the risk of awarding to [***] where no confidence rating could be reasonably assigned.

A327.

Finally, on September 15, 2015, HUD's Source Selection Authority issued a Source Selection Decision for the contract for area 1P, also recommending that HUD award this contract to BLM. A333-36. In its Source Selection Decision for the contract for area 1P, HUD's Source Selection Decision provides that:

> The TEP is proposing award to candidate BLM Companies, LLC with an Acceptable Technical Approach, Good/Significant Confidence rating and at a cost of $73, 262,899.00 [sic]. BLM Companies, LLC's overall past performance in the quality of service, scheduling, cost, business relations and management of key personnel is rated good. BLM Companies, LLC's performance involved the scope, magnitude, and the complexity required in the solicitation and based on this opinion, the offeror was rated "Good/Significant Confidence" overall. BLM Companies, LLC has a good history in servicing and managing REO properties as a subcontractor. The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating is worth a higher price than the unknown confidence of [***] at a lower price. There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price difference is not worth the risk of awarding to [***] where no confidence rating could be reasonably assigned.

A335-36.

On August 27, 2015, HUD awarded the FSM contract for area 3P to BLM.[2] A374-75. Subsequently, on September 28, 2015, HUD awarded the FSM contracts for areas 1D, 1P, 4P, and 5P to BLM. A375.

---

[2] HUD previously awarded the FSM contracts for all eight of the geographical areas addressed under the RFP on September 30, 2014. A374. The agency subsequently took corrective action by reevaluating the proposals and making new source selection decisions. *Id*.

The contracts at issue have a "Start-Up" phase, a "Ramp-Up" phase, and a final phase, wherein the transition period ends and the awardee assumes all new inventory under the contract. A149-51.  BLM is currently performing in the "Ramp-Up" phase of the contract.  Def. Resp. at 20.  BLM was scheduled to begin assuming new inventory under the contract on January 1, 2016.  Status Report, Dec. 31, 2015.  On December 31, 2015, defendant filed a status report informing the Court that HUD voluntarily stayed BLM's performance until January 31, 2016 and extended the incumbent contracts until that time.  *Id*.  The government states that this additional time is needed for BLM to complete transition on the contracts.  *Id*.

### 3. Wallace's GAO Bid Protests

On October 14, 2014, Wallace filed a protest before the United States Government Accountability Office ("GAO") challenging a prior decision by HUD to award the FSM contract for area 3P to BLM.  A374.  HUD subsequently informed the GAO that the agency intended to take corrective action with respect to the award of the FSM contract for area 3P, and the GAO dismissed the protest.  A374.

On September 10, 2015, Wallace filed another protest at the GAO challenging HUD's August 27, 2015 decision to award the FSM contract for area 3P to BLM.  A374-75.  In that protest, Wallace argued that BLM was not qualified or eligible to receive the contract award and that HUD improperly rated the past performance factor in Wallace's proposal.  A375.  Following HUD's decision to award FSM contracts for areas 1D, 1P, 4P, and 5P to BLM, Wallace filed a supplemental protest before the GAO challenging HUD's award decision for area 5P based upon the same or similar grounds as its prior bid protests.  A375.

The GAO dismissed Wallace's protests on December 9, 2015.  A396-98.  In the dismissal decision, the GAO held that Wallace was not an interested party with respect to 3P and 5P because "there is no reasonable likelihood that Wallace would be next in line for award of either of the protested contracts."  A396.  In this regard, the GAO found that "it is reasonable to conclude that at least one, and very likely several, offerors would have been considered for award ahead of Wallace."  A397.  With respect to Wallace's challenge of its rating for the past/present performance factor, the GAO further held that "while Wallace argues that it should have received a good/significant confidence rating based on an assessment of its key personnel experience under the past/present performance factor, our review does not support such a conclusion."  *Id*.  And so, the GAO dismissed the protest.  A396-98.

8

### 4. Organizational Conflict Of Interest

Lastly, the RFP for the subject FSM contracts prohibits contractors from performing pre-conveyance work on FHA Single Family Insured properties. A125. Wallace alleges that BLM performed pre-conveyance work in Pennsylvania and New Jersey. Compl. at 6. HUD conducted an investigation into whether BLM had performed pre-conveyance work in any of the performance areas. A371. In connection with that investigation, HUD sought information from BLM and consulted with HUD employees regarding any pre-conveyance work done by BLM in the areas it received contracts. *Id*. HUD ultimately determined BLM had not performed pre-conveyance work in any areas in which BLM received FSM awards, including Pennsylvania and New Jersey. *Id*.

### B. Procedural Background

Wallace filed its complaint in this matter on December 15, 2015. *See generally* Compl. On that same day, Wallace filed motions for a temporary restraining order and for a preliminary injunction. *See generally* Pl. Mot for TRO; Pl. Mot. In both motions for emergency injunctive relief, Wallace requests that the Court enjoin BLM from commencing performance under the contracts. *Id*.

On December 16, 2015, BLM filed a motion to intervene. Mot. to Intervene. On December 17, 2015, the Court issued a Scheduling Order setting forth the briefing schedule for plaintiff's motions for emergency injunctive relief and granting BLM's motion to intervene. Order, Dec. 17, 2015. On the same day, the Court issued a Protective Order. *See* Protective Order. On December 18, 2015, the government filed its response and opposition to Wallace's motion for a temporary restraining order. *See generally* Def. Resp. The government attached to its response a number of documents, including BLM's Technical Evaluation Panel Report, HUD's Source Selection Decision Document for each performance area, and the GAO's December 9, 2015 bid protest decision. *See generally* Def. Appendix. On December 21, 2015, Wallace filed a reply in support of its motion for a temporary restraining order. *See generally* Pl. Reply.

On December 23, 2015, the Court held a telephonic hearing to discuss Wallace's motions for emergency injunctive relief. During that hearing, the Court issued an oral decision denying Wallace's motions for a temporary restraining order and for a preliminary injunction. The Court's rationale for denying Wallace's motions is set forth below.

## III. JURISDICTION AND LEGAL STANDARDS

### A. Bid Protest Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). The United States Court of Appeals for the Federal Circuit has applied the Competition in Contracting Act's definition of interested party in the context of bid protest matters, which defines the term "interested party" to mean an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or failure to award the contract." *Am. Fed. of Gov. Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

In bid protest cases, this Court reviews agency actions under the "arbitrary and capricious" standard. *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review set forth in the Administrative Procedure Act). And so, under the Administrative Procedure Act standard, an award may be set aside if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). The United States Court of Appeals for the Federal Circuit has explained that:

> When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Id*.

In reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted). In addition, the Court should not substitute its judgment for that of the agency. *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). And so, "[t]he protestor

must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003); *see Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003).

This standard "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). As long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). But, if "the agency entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency," then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted).

## B. Preliminary Injunctions And Temporary Restraining Orders, RCFC 65

The Tucker Act authorizes this Court to "award any relief that the court considers proper, including . . . injunctive relief." 28 U.S.C. § 1491(b)(2); *see* Rule 65 of the Rules of the United States Court of Federal Claims ("RCFC"). However, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted) (citation omitted); *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993) (The award of "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted."). A temporary restraining order is similarly an "extraordinary and drastic remedy". *Jones Automation, Inc. v. United States*, 92 Fed. Cl. 368, 370 (2010) (citations omitted).

In deciding whether to grant emergency injunctive relief, the United States Court of Appeals for the Federal Circuit has directed that the Court consider: (1) whether the plaintiff is likely to succeed on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *OAO Corp. v. United States,* 49 Fed. Cl. 478, 480 (2001);

*Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 266, 268 (1997) (To obtain a temporary restraining order, the plaintiff must show the following: (1) it will suffer irreparable injury unless the temporary restraining order issues; (2) the threatened injury to the moving party outweighs any damage to the opposing party; (3) the temporary restraining order, if issued, will not be adverse to the public interest; and (4) a substantial likelihood exists that the moving party will prevail on the merits.).

"Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction." *Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)).  In addition, "[n]o one factor, taken individually, is necessarily dispositive," and "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp.*, 3 F.3d at 427.  But, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned to the other factors, to justify the denial" of a motion for a preliminary injunction or for a temporary restraining order.  *Id.*

### IV.   ANALYSIS

In its motions for a temporary restraining order and for a preliminary injunction, Wallace requests that the Court enjoin BLM's performance under the FSM contracts until the resolution of this matter.  *See generally* Pl. Mot. for TRO; Pl. Mot.  In this regard, Wallace argues that HUD's decision to award these contracts to BLM was unreasonable because HUD improperly evaluated the past/present performance factor for the proposals submitted by Wallace and BLM.  *See generally* Pl. Mot. for TRO; Pl. Mot.; Pl. Memo.  Wallace also argues that the Court should set aside HUD's award decision because BLM has an organizational conflict of interest and BLM is unqualified to perform the FSM contracts.  *Id.*

The government opposes Wallace's motions and argues that Wallace has not met its heavy burden to show that it is entitled to emergency injunctive relief.  *See generally* Def. Resp.  Specifically, the government argues that HUD acted reasonably in awarding the subject contracts to BLM and that the factors that the Court must consider in weighing a motion for emergency injunctive relief weigh against granting Wallace's motions.  *See generally* Def. Resp.  For the reasons discussed below, the undisputed facts in this matter show that Wallace has not established that it is entitled to emergency injunctive relief.  And so, the Court must deny Wallace's motions.  RCFC 65.

### A. Wallace Has Not Shown That It Is Entitled To Injunctive Relief

It is well established that temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Mazurek*, 520 U.S. at 972 (emphasis omitted) (citation omitted); *Intel Corp.*, 995 F.2d at 1568 (The award of "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted."); *see also Jones Automation*, 92 Fed. Cl. at 370 (2010) (holding that a temporary restraining order is an "extraordinary and drastic remedy") (citations omitted).

When deciding whether to grant such emergency injunctive relief, the United States Court of Appeals for the Federal Circuit has held that this Court must consider four factors: (1) whether the plaintiff is likely to succeed on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *OAO Corp.*, 49 Fed. Cl. at 480; *Cincom Sys., Inc.*, 37 Fed. Cl. at 268 (applying the same four-factor test when determining whether to grant a motion for a temporary restraining order).

A movant must establish the existence of both of the first two factors to be entitled to injunctive relief. *Altana Pharma AG,* 566 F.3d at 1005 (citing *Amazon.com, Inc.*, 239 F.3d at 1350). In addition, "[n]o one factor, taken individually, is necessarily dispositive," and "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp.*, 3 F.3d at 427. But, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned to the other factors, to justify the denial" of a motion for injunctive relief. *Id*. For the reasons discussed below, Wallace has not met its burden to establish that it is entitled to emergency injunctive relief in this bid protest matter.

#### 1. The Undisputed Facts Suggests That Wallace Is Not An Interested Party

As an initial matter, the record currently before the Court calls into question whether Wallace is an interested party with standing to pursue its claims. In this regard, it is well settled that, under the Tucker Act, only an "interested party" has standing to object to the award of a contract. 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has defined the term "interested party" to mean an "actual or prospective bidder or offeror whose direct

economic interest would be affected by the award of the contract or failure to award the contract." *Am. Fed. of Gov. Employees, AFL-CIO*, 258 F.3d at 1302. And so, to have standing here, Wallace must show that its direct economic interest was affected by the award of the FSM contracts. *Id*.

In this case, it is undisputed that, for four of the five contracts at issue, Wallace would not have been the next offeror in line for award if BLM were disqualified from receiving the contract awards. A284; A292; A320-21; A325-26. In this regard, the record currently before the Court shows that, with respect to the FSM contracts for areas 1D, 3P, 4P, and 5P, there was at least one lower-priced, technically acceptable offer−other than BLM's offer−that received a higher rating for the past/present performance factor than Wallace. A284; A292; A320-21; A325-26.

Specifically, with respect to the FSM contract for area 1D, there were fifteen technically acceptable offers, other than BLM, that proposed a lower price than Wallace, including one offer with a good/significant confidence rating for the past/present performance factor. A295-96. For the FSM contract for area 3P, there were six technically-acceptable offers, other than BLM, that proposed a lower price than Wallace, including one offer with a good/significant confidence rating for the past/present performance factor. A316-17; A397. For the FSM contract for area 4P, there were eleven technically-acceptable offers, other than BLM, that proposed a lower price than Wallace, including one with a good/significant confidence rating for the past/present performance factor. A320-21. For the FSM contract for area 5P, there were ten technically-acceptable offers, other than BLM, that proposed a lower price than Wallace, including two offers that received a good/significant confidence rating for the past/present performance factor. A325-26; A397. Given this, the record evidence suggests that Wallace would not have been awarded these four contracts if the award to BLM were to be set aside. And so, Wallace does not have a direct economic interest that was affected by the award of these four contracts to BLM. *Am. Fed. of Gov. Employees, AFL-CIO*, 258 F.3d at 1302.

In the reply brief in support of its motions for emergency injunctive relief, Wallace argues, without any support from the record, that it "should have been rated Excellent/High Confidence or at least Good/Significant Confidence" for the past/present performance factor. Pl. Reply at 9. Wallace further argues that such a rating "would have put [Wallace] ahead of all other offerors in area 4P who were rated Fair and the appropriate Excellent rating would have placed [Wallace] ahead of the other offerors in the other Areas described in the Record (Areas 1D, 3P, and 5P)." *Id*. But, Wallace does not dispute the salient fact that at least one other offeror proposed an offer that

was superior to Wallace's offer with respect to four of the five FSM contracts in dispute. *Id*. And so, Wallace has not persuaded the Court it is an interested party with standing to challenge HUD's award decisions with respect to these four contracts. *See Am. Fed. of Gov. Employees, AFL-CIO*, 258 F.3d at 1302.

### 2. Wallace Has Not Demonstrated Irreparable Harm

The matter of whether Wallace has standing to bring its claims with respect to four of the five FSM contracts at issue in this case, alone, is not fully dispositive of Wallace's request for emergency relief. Nonetheless, for the reasons discussed below, the factors that the Court must weigh when considering whether to grant Wallace's motions for emergency injunctive relief weigh against granting Wallace's motions.

First, with respect to whether Wallace will be irreparably harmed if the Court does not grant the request for injunctive relief, this Court has held that "denial of a fair opportunity to compete" under a solicitation "and loss of financial benefit from a lawful procurement process" may constitute irreparable harm. *See, e.g., BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 514 (2013). But, in terms of the injunctive relief that Wallace seeks here–namely, that BLM be enjoined from commencing performance–Wallace's position would be the same regardless of whether the Court grants or denies this request. Wallace is not the incumbent contractor under any of the subject FSM contracts. Compl. at 6-8. And so, it is without dispute that Wallace's position with respect to the performance of these contracts would be the same regardless of whether the Court enjoins BLM from starting performance.

Nonetheless, even if the Court were to find that Wallace will suffer irreparable harm here, the record currently before the Court shows that Wallace is not likely to succeed upon the merits of its claims.

### 3. Wallace Is Unlikely To Succeed Upon The Merits Of Its Claims

#### a. Wallace's Past/Present Performance Rating

The record before the Court does not support Wallace's claim that HUD underrated its past/present performance factor and overrated BLM's past/present performance factor. In this regard, there is no dispute that Wallace received a rating of neutral/unknown confidence for the past/present performance factor. A341. It is also undisputed that Wallace identified three past efforts and proposed at least five key personnel who worked for other field service management contractors to satisfy the past/present performance factor. A341-3. The record before the Court

demonstrates that HUD determined that these past efforts were not relevant. A341. And so, HUD rated Wallace's past/present performance factor as neutral/unknown confidence. A296; A317; A321; A326; A335; A341.

In regards to Wallace's challenge to this rating, the record shows that HUD determined that the personnel proposed by Wallace were not relevant, because Wallace submitted offers for contracts in five different geographic areas, but failed to specify which key personnel with relevant experience would be committed to a particular contract area. A380. Wallace does not dispute the fact that it did not specify which members of its key personnel would be committed to the geographic areas specified in the contracts. *Id*. And so, the undisputed record evidence currently before the Court shows that there was a rational basis for the government's decision to rate Wallace's past/present performance factor as neutral/unknown confidence.

### b. BLM's Past/Present Performance Rating

Wallace's claim that HUD overrated BLM's past/present performance is also contradicted by the record before the Court. It is without dispute that BLM submitted three past/present performance efforts in which it provided FSM services as a subcontractor. A265. The record before the Court also shows that, based upon this information, HUD determined that BLM "has shown a good history of performance, as well as the capability to manage a project of this magnitude." *See*, *e.g.*, A285. Wallace points to no evidence in the record to show that the agency's determination regarding BLM's past/present performance was improper. *See generally* Pl. Reply. Given this, HUD's decision to rate BLM's past/present performance factor as good/significant confidence appears reasonable, and Wallace is unlikely to succeed upon the merits of this claim.

### c. Organizational Conflict of Interest

Wallace's claim that BLM has an unresolved organizational conflict of interest, and that HUD failed to properly investigate the alleged conflict, is also contradicted by the current record evidence. The United States Court of Appeals for the Federal Circuit has held that the Federal Acquisition Regulation only obligates an agency to conduct an organizational conflict of interest analysis for significant conflicts. *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (holding that agencies are only required to document "significant potential conflicts"); FAR 9.504(a)(2). In addition, contracting officers are given broad discretion in determining whether the potential conflict of interest is significant. *Id*.

The parties agree that the RFP for the subject contracts prohibits contractors from performing pre-conveyance work on FHA Single Family Insured properties. A125. Wallace maintains that BLM has provided such pre-conveyance work in two of the areas for which it has been awarded contracts. Compl. at 6. To support this allegation, Wallace has provided the Court with an affidavit from its President, Kevin Wallace, which states that:

> While WAM was preparing its proposal in response to the Solicitation I was approached by Brent Martin, the owner of BLM Companies, LLC ("BLM") offering to provide me with inspection services on Bank owned homes in Eastern Pennsylvania. In our discussion, Mr. Martin stated that he provided inspection services for the incumbent HUD FSM contractor Innotion Enterprises, Inc. as well as two other companies one named Safeguard and the other called Sentinel Field Services.
>
> I have personal knowledge that Safeguard provides pre-conveyance services in Pennsylvania for homes mortgaged by Freddie Mae [sic] and Fannie Mac [sic] which are not HUD's Federal Housing Administration ("FHA"). The services described as creating a conflict interest in the Solicitation. Sentinal was doing Freddie Mac and other pre-conveyance work in Pennsylvania.

Pl. Reply at 9-10.

The record currently before the Court shows that HUD conducted a reasonable investigation into whether BLM had performed pre-conveyance work and that the agency did not find any evidence that BLM performed pre-conveyance work in any of the areas for which BLM had been awarded a contract. A371. Specifically, in a memorandum for the file dated October 9, 2015, Craig Karnes, the Principal Administrative Contracting Officer, states that he sought information about BLM's potential pre-conveyance work in area 3P from BLM and also consulted HUD employees regarding the existence of any pre-conveyance work in any of the other areas for which BLM had been awarded a contract. A371; A377. HUD concluded that there was no evidence to indicate that BLM performed any past or present pre-conveyance work that would give rise to an organizational conflict of interest. A371. And so, the record currently before the Court shows that HUD appropriately investigated the alleged organizational conflict involving BLM and reasonably concluded that there was no evidence to indicate the existence of a significant organizational conflict of interest with respect to BLM.

### d.  Wallace's Challenge Of BLM's Qualifications

Lastly, Wallace's final challenge to HUD's award decisions–that BLM was not qualified to be awarded the subject contracts–is also unsupported by the record. As previously mentioned, the record before the Court shows that HUD appropriately rated the past/present performance factor

with respect to the proposals submitted by BLM and that HUD reasonably rated this factor as good/significant confidence. A264-66. Wallace, nonetheless, alleges that BLM is unqualified to perform the subject contracts because BLM relies too heavily upon a large business subcontractor. Compl. at 7. But, Wallace provides no evidence to support this allegation. *Id.* Given this, Wallace has not met its burden to show that it has a substantial likelihood of success upon the merits of this claim.

In sum, Wallace has not met its burden to show that it is substantially likely to succeed upon the merits in this case. For this reason, the Court must deny Wallace's request for emergency injunctive relief.

### 4. The Remaining Factors Weigh Against Granting Injunctive Relief

The remaining factors that the Court considers when weighing whether to grant a motion for a temporary restraining order or for a preliminary injunction also weigh against granting Wallace's motions.

First, with respect to the balance of the hardships for Wallace and the government if the Court were to grant injunctive relief, any harm that Wallace would suffer as a result of the loss of its motions is outweighed by the harm to the government, and to BLM, if the Court were to enjoin BLM's performance. *See PGBA*, 389 F.3d at 1229 (in considering a motion for a preliminary injunction, the Court balances the harm the movant would suffer without preliminary relief, against the harm that preliminary relief would inflict on the non-movant); *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009) ("Generally, if the balance tips in favor of defendant, a preliminary injunction is not appropriate."); *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715-16 (2006). According to the government, BLM has begun the "Ramp-Up" phase of the contracts. Def. Resp. at 20. BLM has spent significant resources–approximately $600,000 by the end of the year according to the government–in this phase. Pl. Memo. at 20. The government also advises that it will incur an additional cost of approximately $79,927 per day if BLM is enjoined from commencing performance. Def. Memo. at 20.

On the other hand, Wallace is not currently performing under any of the contracts. Compl. at 6-8; *see also* Status Report, Dec. 31, 2015. And so, as discussed above, Wallace's position remains the same regardless of whether the Court allows BLM to begin performance or enjoins

BLM from commencing performance. Compl. at 6-8. Given this, the hardship resulting from a stay of BLM's performance would be significant for the government and for BLM.

In addition, the public interest is best served by denying the requested injunctive relief. In this regard, the public has an interest in ensuring that the homes HUD maintains are safe and do not pose health or safety concerns for the public. Ensuring that the FSM contracts can proceed as scheduled will promote this important public interest.

And so, for all of the above reasons, denial of Wallace's motion for a temporary restraining order is warranted.[3] Because the Court considers the same factors discussed above when considering Wallace's motion for a preliminary injunction, the Court also denies Wallace's motion for a preliminary injunction.

## V.    CONCLUSION

In sum, Wallace has not met its heavy burden to show that it is entitled to a temporary restraining order or to a preliminary injunction. First, Wallace does not appear to have standing to challenge the contract awards for four of the five contracts in dispute in this matter. In addition, even if the Court were to accept that Wallace would suffer irreparable harm if the Court were to deny its motions, Wallace has failed to demonstrate that it is likely to succeed upon the merits of its claims. In this regard, the record currently before the Court shows that HUD conducted a reasonable evaluation of the past/present performance factor for the offers submitted by Wallace and BLM. The record also shows that HUD appropriately investigated the potential organizational conflict of interest involving BLM, and that BLM is qualified to perform the subject contracts. Lastly, the public interest in ensuring that the properties maintained by HUD are safe for the public is best served by denying Wallace's motion.

For these reasons, the Court will not interfere with this procurement by enjoining BLM's performance under the contracts. And so, the Court denies Wallace's motion for a temporary restraining order.

Because the arguments in Wallace's motion for a preliminary injunction are identical to those raised in its motion for a temporary restraining order, and the legal standards that the Court

---

[3] Because Wallace has not established that it is entitled to a temporary restraining order or to a preliminary injunction, the Court does not reach the question of the amount of bond.

must apply in deciding the two motions are the same, the Court also denies Wallace's motion for a preliminary injunction.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the Protective Order entered in this matter on December 17, 2015. This Memorandum Opinion and Order shall therefore be filed under seal. The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the Protective Order prior to publication.

The Court hereby **ORDERS** that the parties **FILE** a joint status report, on or before **Friday, February 5, 2016**, identifying the information, if any, that they contend should be redacted in this Memorandum Opinion and Order, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED**.

                                          s/ Lydia Kay Griggsby
                                         LYDIA KAY GRIGGSBY
                                         Judge