# In the United States Court of Federal Claims

BID PROTEST
No. 15-1527C
Filed Under Seal: May 6, 2016
Reissued for Publication: May 31, 2016[*]

|  |  |  |
|---|---|---|
| | ) | |
| WALLACE ASSET MANAGEMENT, LLC, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | The Tucker Act, 28 U.S.C. § 1491(b)(1); |
| | ) | 28 U.S.C. § 1491(b)(2); Post-Award Bid |
| THE UNITED STATES, | ) | Protest; RCFC 52.1. |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BLM COMPANIES, LLC, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*James S. DelSordo*, Counsel of Record, Argus Legal, PLLC, Manassas, VA, for plaintiff.

*Agatha Koprowski*, Trial Attorney, *Douglas K. Mickle,* Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; and *Julie K. Cannati*, Of Counsel, *Linda Fallowfield*, Of Counsel, United States Department of Housing and Urban Development, for defendant.

*Douglas P. Hibshman*, Counsel of Record, Fox Rothschild, LLP, Washington, DC, for defendant-intervenor.

---

[*] This Memorandum Opinion and Order was originally filed under seal on May 6, 2016 (docket entry no. 31), pursuant to the Protective Order entered in this action on December 17, 2015 (docket entry no. 11). The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the Protective Order. The parties filed a joint status report on May 26, 2016 (docket entry no. 33) proposing certain redactions which the Court has adopted. Accordingly, the Court is reissuing its Opinion and Order dated May 6, 2016, with the agreed redactions indicated by three consecutive asterisks within brackets ([***]).

## <u>MEMORANDUM OPINION AND ORDER</u>

<u>GRIGGSBY</u>, Judge

## I.    INTRODUCTION

Plaintiff, Wallace Asset Management, LLC ("Wallace"), brought this post-award bid protest matter challenging the decisions of the United States Department of Housing and Urban Development ("HUD") to award five contracts to provide field service management services to BLM Companies, LLC ("BLM").  Wallace has moved for judgment upon the administrative record.  The government has also moved to dismiss Wallace's claims or, in the alternative, for judgment upon the administrative record.  The defendant-intervenor in this matter, BLM, has also moved for judgment upon the administrative record.  For the reasons set forth below, the Court **DENIES** Wallace's motion for judgment upon the administrative record; **GRANTS** the government's motion to dismiss or, in the alternative, for judgment upon the administrative record; and **GRANTS** BLM's motion for judgment upon the administrative record.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.    Factual Background

The relevant facts in this case are not in dispute.  Wallace is a disappointed offeror challenging HUD's decisions to award several government contracts for field service management ("FSM") services to BLM.  *See generally* Compl.  Specifically, Wallace challenges HUD's award decisions upon three grounds.  First, Wallace argues that HUD improperly evaluated the past and present performance factor for the proposals submitted by Wallace and BLM.  Pl. Mot. at 1; Pl. Memo. at 1-2.  Second, Wallace further argues that BLM has an organizational conflict of interest that HUD failed to adequately investigate.  Pl. Mot. at 1; Pl. Memo. at 1-2, 13.  Lastly, Wallace

---

[1] The facts recited in this Memorandum Opinion and Order are taken from plaintiff's complaint ("Compl. at __"); the administrative record ("AR at __"); plaintiff's motion for judgment upon the administrative record ("Pl. Mot. at __"); plaintiff's memorandum in support of its motion for judgment upon the administrative record ("Pl. Memo. at __"); the government's motion to dismiss or, in the alternative, for judgment upon the administrative record ("Def. Mot. at __"); BLM's motion for judgment upon the administrative record ("Int. Mot. at __"); plaintiff's response to the government's and BLM's motions for judgment upon the administrative record and plaintiff's reply in support of its motion for judgment upon the administrative record ("Pl. Rep. at __"); the government's reply in support of its motion for judgment upon the administrative record ("Def. Rep. at __"); and BLM's reply in support of its motion for judgment upon the administrative record ("Int. Rep. at __").  Except where otherwise noted, the facts cited herein are undisputed.

contends that HUD failed to follow the evaluation criteria set forth in the RFP in reaching its award decisions.  Pl. Mot. at 1; Pl. Memo. at 1-2, 14-15.

As background, the Federal Housing Administration ("FHA"), a division of HUD, "insures approved lenders against the risk of loss on mortgages obtained with FHA financing."  AR at 284. If there is a default on a mortgage, the mortgage lender may reclaim the property, file a claim for insurance benefits and convey the property to HUD.  *Id*.  HUD manages the conveyed property for eventual sale and contracts for the maintenance of these properties *via* FSM contracts.  *Id*. Contractors performing FSM contracts "provide property maintenance and preservation services," including "inspecting the property, securing the property, performing cosmetic enhancements/repairs, and providing on-going maintenance."  *Id*. at 287.

## 1.    The Request For Proposals

On May 22, 2014, HUD issued Request for Proposals No. DU204SA-13-R-0004 ("RFP") to provide FSM services in eight different geographic areas located across the United States.  *Id*. at 1, 269, 390-91.  Under the terms of the RFP, HUD would award one indefinite-delivery, indefinite-quantity contract, consisting of one base year and four option years, in each of the eight geographic areas.  *Id*. at 272-76, 417.

Wallace and BLM both submitted proposals for FSM contracts in, area 1D, encompassing Utah, Colorado, New Mexico and Northern Texas; area 1P, encompassing Michigan; area 3P, encompassing Maine, Vermont, New York, New Hampshire, Rhode Island, New Jersey, Massachusetts and Connecticut; area 4P, encompassing Ohio; and area 5P, encompassing Pennsylvania, West Virginia, Virginia, Delaware, Maryland and the District of Columbia.  *Id*. at 368-70, 441, 1390-480, 4372-484, 4531.  In addition, BLM's proposal also covered the remaining three areas not at issue in this case.  *Id.* at 1390-480.  Several other contractors also submitted proposals in response to the RFP.  *Id.* at 915-1389, 1481-4371.  The RFP also contemplated that all of the awards at issue here would be small business set-asides.  *Id.* at 373, 419-20; *see also* 48 C.F.R. § 52.219-14.

The RFP provided that the government would conduct the solicitation using a Performance Price Trade-Off ("PPT") methodology.  AR at 433.  Under the RFP, the technical approach factor would be evaluated on a pass/fail basis.  *Id*. at 434.  If an offeror's proposal was deemed technically acceptable, HUD would then evaluate offerors' past/present performance and price.  *Id*. at 433-34.

In addition, the RFP provided that the past/present performance and price factors were of equal weight. *Id*. at 433.

### a.      Technical Approach

With respect to the technical approach factor under the RFP, HUD rated the proposals submitted by Wallace and BLM as technically acceptable. *Id*. at 609, 630, 638, 643, 672. And so, both proposals advanced to the next round of the evaluation process. *Id*.

### b.      Past/Present Performance

With respect to the past/present performance factor, the RFP required that offerors submit information about their past or present performance on other contracts for similar services. *Id*. at 436. Alternatively, in the event that an offeror did not have any relevant past contract experience, the RFP provided, in pertinent part, that:

> Offerors or joint venture partners that either have no prior contracts or do not possess relevant corporate Past/Present Performance, but have key personnel with relevant past performance while employed by another company(s), may demonstrate the performance of such key personnel by submitting the names, letter of commitment and summary sheets for three of the most recent and relevant contracts under which such key personnel performed the same role currently being proposed on the instant acquisition.

*Id*. at 427-28; *see also id*. at 228, 438. The RFP required that key personnel "devote 100% of time and effort to the contract(s)." *Id*. at 227; *see also id*. at 354. The RFP further provided that, "For any offeror that submit [sic] more than three recent contracts for the offeror/joint venture, key personnel and subcontractors for evaluation, the contracting officer will select only the three recent contracts for evaluation and the other contracts will not be evaluated." *Id*. at 437. Lastly, the RFP provided for the following ratings of the past/present performance factor in descending order: "excellent/high confidence"; "good/significant confidence"; "fair/some confidence"; "unacceptable/low confidence"; and "neutral/unknown confidence." *Id*. at 439.

Wallace addressed the past/present performance factor in its proposal by identifying three past corporate contract efforts and submitting past/present performance information for at least five key personnel who worked for other FSM contractors. *Id*. at 538-44. During its evaluation, HUD determined that the three past contracts identified by Wallace for this factor were not relevant. *Id*. at 538-44, 5373-74. Specifically, HUD determined that the first contract was not relevant because Wallace failed to provide the volume of properties that Wallace managed under that contract. *Id*. at

569-70, 5373-74.  HUD also found that the scopes of work for the two other contracts cited by Wallace were "not similar to the solicitation requirements" at issue here.  *Id*.  In addition, because the RFP provided that "the contracting officer will select only the three recent contracts for evaluation and the other contracts will not be evaluated," HUD did not assign performance ratings for key personnel proposed by Wallace.  *Id*. at 437; Def. Mot. at 9.  And so, HUD rated Wallace's proposal with respect to the past/present performance factor as "neutral/unknown confidence."  AR at 5373-74.

BLM addressed the past/present performance factor in its proposal by submitting three past subcontracting efforts.  *Id*. at 1446-49; 5429-31.  For each of the five areas at issue, HUD determined that BLM had "successfully performed most of the scope of this solicitation through 3 efforts as a subcontractor on 3 FSM contracts with superior ratings throughout the service period in the areas of Quality of Product, Schedule, Cost, Business Relations, and Management of Key Personnel."  *Id*. at 5429-31.  And so, HUD rated BLM's proposal with respect to the past/present performance factor as "good/significant confidence."  *Id*. at 610, 630, 639, 644, 673, 5434-42.

### c. Price

Lastly, with respect to the price factor, it is without dispute that Wallace's proposed price was higher than BLM's proposed price for each of the five FSM contracts.  *Id*. at 609, 630, 638, 643, 672.  Specifically, for area 1D, BLM's proposed price was $112,969,979.00, whereas Wallace's proposed price was $192,453,895.00.  *Id*. at 609, 4993.  For area 1P, BLM's proposed price was $73,262,899.00, and Wallace's proposed price was $86,762,390.00.  *Id*. at 672, 5015.  For area 3P, BLM's proposed price was $46,622,975.00 and Wallace's proposed price was $58,525,100.00.  *Id*. at 630, 5020.  For area 4P, BLM's proposed price was $61,375,629.00, whereas Wallace's proposed price was $91,030,480.00.  *Id*. at 638, 5025.  Lastly, for area 5P, BLM's proposed price was $83,733,750.00, and Wallace's proposed price was $124,707,630.00. *Id*. at 643, 5030.

In addition, for all five of the FSM contracts at issue, at least one offeror–other than BLM– had a technically acceptable proposal, that proposed both a lower price than Wallace and received a higher rating that Wallace for the past/present performance factor.  *Id*. at 609-10, 630-31, 638-39, 643-44, 672-73.

### 2.      Award Of The Contracts

On August 6, 2015, HUD's Source Selection Authority issued Source Selection Decisions for the contracts for areas 1D and 3P, recommending that HUD award these contracts to BLM. *Id.* at 608-12, 629-32.  In its Source Selection Decision for the contract for area 1D, HUD's Source Selection Decision provides that:

> The TEP [Technical Evaluation Panel] is proposing award to candidate, BLM Companies, LLC, with the highest confidence rating and the second lowest contract cost of $112,969,979.00.  BLM Companies, LLC's Present/Past Performance involved the same scope, magnitude and complexity of work required in the solicitation resulting in a rating of Good/Significant Confidence.  BLM Companies, LLC's overall quality of services, scheduling, cost, business relations and management of key personnel was rated excellent.  BLM Companies, LLC's Technical Approach was rated Acceptable, which illustrates their abilities to manage, maintain, and/or preserve HUD-owned properties.  The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating is worth a higher price than the unknown confidence of [***] at a lower price.  There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price differences is not worth the risk of awarding to [***] where no confidence rating could be reasonably assigned.

*Id.* at 611.  With respect to the contract for area 3P, HUD's Source Selection Decision provides that:

> The TEP is proposing award to candidate, BLM Companies, LLC, with an Acceptable Technical Approach and Good/Significant Confidence rating and the third lowest contract cost of acceptable offerors at a cost of $46,622,975.  BLM Companies, LLC's overall past performance in the quality of service, scheduling, cost, business relations and management of key personnel is rated good.  BLM Companies, LLC's performance involved the scope, magnitude and complexity required in the solicitation and based on this opinion, the offeror was rated "Good/Significant Confidence" overall.  The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating, is worth a higher price than the unknown confidence of [***] and [***] at a lower price.  There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price difference is not worth the risk of awarding to [***] or [***], where no confidence rating could be reasonably assigned.

*Id.* at 631.

On August 26, 2015, HUD's Source Selection Authority issued Source Selection Decisions for the contracts for areas 4P and 5P, recommending that HUD award these contracts to BLM. *Id.* at 637-46.  With respect to the contract for area 4P, HUD's Source Selection Decision provides that:

The TEP is proposing award to candidate, BLM Companies, LLC, with an Acceptable Technical Approach, Good/Significant Confidence rating and at a cost of $$61,375,629.00 [sic].  BLM Companies, LLC's overall past performance in the quality of service, scheduling, cost, business relations and management of key personnel is rated good.  BLM Companies, LLC's performance involved the scope, magnitude and complexity required in the solicitation and based on this opinion, the offeror was rated "Good/Significant Confidence" overall.  The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating, is worth a higher price than the unknown confidence of [***] at a lower price.  There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price difference is not worth the risk of awarding to [***] where no confidence rating could be reasonably assigned.

*Id*. at 640.  With respect to the contract for area 5P, HUD's Source Selection Decision provides that:

The TEP is proposing award to candidate, BLM Companies, LLC, with an Acceptable Technical Approach, Good/Significant Confidence rating and at a cost of $83,733,750.00.  BLM Companies, LLC's overall past performance in the quality of service, scheduling, cost, business relations and management of key personnel is rated good.  BLM Companies, LLC's performance involved the scope, magnitude and complexity required in the solicitation and based on this opinion, the offeror was rated "Good/Significant Confidence" overall.  The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating, is worth a higher price than the unknown confidence of [***] at a lower price.  There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price difference is not worth the risk of awarding to [***] where no confidence rating could be reasonably assigned.

*Id*. at 645.

Finally, on September 15, 2015, HUD's Source Selection Authority issued a Source Selection Decision for the contract for area 1P, also recommending that HUD award this contract to BLM.  *Id*. at 671-74.  In its Source Selection Decision for the contract for area 1P, HUD provides that:

The TEP is proposing award to candidate BLM Companies, LLC with an Acceptable Technical Approach, Good/Significant Confidence rating and at a cost of $73, 262,899.00 [sic].  BLM Companies, LLC's overall past performance in the quality of service, scheduling, cost, business relations and management of key personnel is rated good.  BLM Companies, LLC's performance involved the scope, magnitude, and the complexity required in the solicitation and based on this opinion, the offeror was rated "Good/Significant Confidence" overall.  BLM Companies, LLC has a good history in servicing and managing REO properties as a subcontractor.  The TEP believes that the verified past performance of BLM Companies, LLC with a good confidence rating is worth a higher price than the unknown confidence of [***] at a

7

lower price.  There is reasonable expectation that BLM Companies, LLC can successfully perform the services and the price difference is not worth the risk of awarding to [***] where no confidence rating could be reasonably assigned.

*Id*. at 673-74.

On August 27, 2015, HUD awarded the FSM contract for area 3P to BLM.  *Id*. at 647, 5764. Subsequently, on September 28, 2015, HUD awarded the FSM contracts for areas 1D, 1P, 4P, and 5P to BLM.  *Id*. at 5714, 5765.  BLM began assuming all new inventory under these contracts on February 1, 2016.  Status Report, Dec. 31, 2015.

### 3. Organizational Conflict Of Interest Allegation

Wallace also alleges in this matter that BLM is ineligible to perform the FSM contracts because BLM has an organizational conflict of interest, due to alleged pre-conveyance work performed in Pennsylvania and New Jersey.  Compl. at 6; Pl. Memo. at 7, 13.  In this regard, the RFP for the FSM contracts prohibits contractors from performing pre-conveyance work on FHA Single Family Insured properties.  AR at 310, 352.  To this end, HUD conducted an investigation into whether BLM had performed any pre-conveyance work in any of the performance areas covered by the FSM contracts.  *Id*. at 729.  In connection with that investigation, HUD sought information from BLM and consulted with HUD employees regarding any pre-conveyance work done by BLM in these areas.  *Id*. at 691-96, 729.  HUD ultimately determined that BLM had not performed pre-conveyance work in any areas for which BLM had been awarded a FSM contract, including Pennsylvania and New Jersey.  *Id*. at 729.  And so, the agency did not find any evidence to show that an organizational conflict of interest exists with respect to alleged pre-conveyance work.  *Id*.

### 4. Wallace's GAO Bid Protests

In October 2014, Wallace filed a protest before the United States Government Accountability Office ("GAO") challenging a prior decision by HUD to award the FSM contract for area 3P to BLM.  *Id*. at 5167-5180, 5182-84.  HUD subsequently informed the GAO that the agency intended to take corrective action with respect to the award of the FSM contract for area 3P, and the GAO dismissed the protest.  *Id*. at 5185-86.

In September 2015, Wallace filed another protest at the GAO challenging HUD's August 27, 2015 decision to award the FSM contract for area 3P to BLM.  *Id*. at 5678-82, 5789.  In that protest, Wallace argued that BLM was not qualified or eligible to receive the contract award and

that HUD improperly rated the past performance factor in Wallace's proposal.  *Id*. at 5765, 5792.
Following HUD's decision to award FSM contracts for areas 1D, 1P, 4P, and 5P to BLM, Wallace
filed a supplemental protest before the GAO challenging HUD's award decision for area 5P based
upon the same or similar grounds as its prior bid protests.  *Id*. at 5719-36.

The GAO dismissed Wallace's protests on December 9, 2015.  *Id*. at 5853-56.  In the
dismissal decision, the GAO held that Wallace was not an interested party with respect to 3P and 5P
because "there is no reasonable likelihood that Wallace would be next in line for award of either of
the protested contracts."  *Id*. at 5853.  In this regard, the GAO found that "it is reasonable to
conclude that at least one, and very likely several, offerors would have been considered for award
ahead of Wallace."  *Id*. at 5854.  With respect to Wallace's challenge to its rating for the
past/present performance factor, the GAO further held that "while Wallace argues that it should
have received a good/significant confidence rating based on an assessment of its key personnel
experience under the past/present performance factor, our review does not support such a
conclusion."  *Id*.  And so, the GAO dismissed the protest.  *Id*. at 5853-56.

### B.    Procedural Background

Wallace filed its complaint in this matter on December 15, 2015.  *See generally* Compl.  On
that same day, Wallace filed motions for a temporary restraining order and for a preliminary
injunction.  *See generally* Pl. Mot. for TRO; Pl. Mot. for PI.  On December 16, 2015, BLM filed a
motion to intervene.  Mot. to Intervene.  On December 17, 2015, the Court issued a Scheduling
Order setting forth the briefing schedule for plaintiff's motions for emergency injunctive relief and
granting BLM's motion to intervene.  Order, Dec. 17, 2015.  On the same day, the Court issued a
Protective Order.  *See* Protective Order.

On December 18, 2015, the government filed its response and opposition to Wallace's
motion for a temporary restraining order.  *See generally* Def. Resp.  The government attached to its
response a number of documents, including BLM's Technical Evaluation Panel Report, HUD's
Source Selection Decision Document for each performance area, and the GAO's December 9, 2015
bid protest decision.  *See generally* Def. Appendix.  On December 21, 2015, Wallace filed a reply in
support of its motion for a temporary restraining order.  *See generally* Pl. Rep.

On December 23, 2015, the Court held a telephonic hearing on Wallace's motions for
emergency injunctive relief.  During that hearing, the Court issued an oral decision denying

Wallace's motions for a temporary restraining order and for a preliminary injunction.  The Court subsequently issued a written Memorandum Opinion and Order denying Wallace's motions on January 13, 2016.  *See* Memo. Opinion and Order, Jan. 13, 2016.  In the Memorandum Opinion and Order, the Court held that Wallace lacks standing to challenge the contract awards for four of the five contracts in dispute in this case because at least one other offeror had a higher rating than Wallace with respect to two of the evaluation factors.  *Id*.  The Court further held that Wallace failed to demonstrate that it was likely to succeed upon the merits of its claims, because Wallace lacked standing to pursue most of its claims and the record before the Court at that time demonstrated that HUD's decisions to award the FSM contracts to BLM were reasonable and in accordance with law.

On January 8, 2016, the government filed the administrative record in this matter.  *See generally* AR.  On January 22, 2016, Wallace filed a motion for judgment upon the administrative record and a memorandum in support of its motion for judgment upon the administrative record.  *See generally* Pl. Mot.; Pl. Memo.  On February 5, 2016, the government filed a motion to dismiss or, in the alternative, for judgment upon the administrative record and an opposition to Wallace's motion for judgment upon the administrative record.  *See generally* Def. Mot.  On the same date, BLM filed a motion for judgment upon the administrative record and its opposition to Wallace's motion for judgment upon the administrative record.  *See generally* Int. Mot.  On February 12, 2016, Wallace filed a reply in support of its motion for judgment upon the administrative record and its response to the motions filed by the government and BLM.  *See generally* Pl. Rep.  Finally, on February 19, 2016, the government and BLM filed their reply briefs in support of their respective motions.  *See generally* Def. Rep.; Int. Rep.  The matters having been fully briefed, the Court addresses the pending motions.

## III.     JURISDICTION AND LEGAL STANDARDS

### A.     Bid Protest Jurisdiction And Standing

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The United States Court of Appeals for the Federal Circuit has applied the Competition in Contracting Act's definition of interested party in the context of bid protest matters.

*Am. Fed. of Gov. Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001); *see also* 31 U.S.C. §§ 3551-56.  The Competition in Contracting Act defines the term "interested party" to mean an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or failure to award the contract."  *Id.*  The Federal Circuit has also held that a party has a "direct economic interest" in a contract if it has a "substantial chance of receiving the contract."  *Rex Servs. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) (internal citations omitted).  When the Court determines that a protestor is not an interested party, the protestor lacks standing and the Court must dismiss the case.  *Id.*; *see* RCFC 12(b)(1).

In bid protest cases, this Court reviews agency actions under the "arbitrary and capricious" standard.  *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review set forth in the Administrative Procedure Act).  And so, under the Administrative Procedure Act standard, an award may be set aside if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  In this regard, the Federal Circuit has explained that:

> When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Id.*

In reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted).  In addition, the Court should not substitute its judgment for that of the agency.  *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997).  And so, "[t]he protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law."  *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003); *see Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003).

This standard "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).  As long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).  But, if "the agency entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency," then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted).

### B.    Judgment Upon The Administrative Record

Generally, Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") limits the Court's review of an agency's procurement decision to the administrative record.  RCFC 52.1; *cf. Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) ("[T]he focal point for judicial review should be the administrative record already in existence.").  And so, unlike a summary judgment motion brought pursuant to Rule 56, the existence of genuine issues of material fact does not preclude judgment upon the administrative record under Rule 52.1.  RCFC 56; *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011).  Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

In addition, when deciding a bid protest matter, the Court "may award any relief that [it] considers proper, including declaratory and injunctive relief . . . ."  28 U.S.C. § 1491(b)(2); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1036-37 (Fed. Cir. 2009).  In considering whether to issue a permanent injunction, the Court looks to (1) whether plaintiff succeeded on the merits; (2) whether plaintiff will suffer irreparable harm in the absence of injunctive relief; (3) whether the balance of hardships to the parties favors granting injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *CW Government Travel, Inc. v. United States*, 163 F. App'x 853, 857 (Fed. Cir. 2005); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  To that end, to prevail upon a request for injunctive relief, a plaintiff must show

an entitlement to injunctive relief by clear and convincing evidence. *CSE Constr. Co., Inc. v. United States*, 58 Fed. Cl. 230, 261 (2003).

## IV.  LEGAL ANALYSIS

Wallace challenges HUD's award decisions in this matter upon three grounds. First, Wallace argues that HUD's decisions to award the FSM contracts to BLM were unreasonable, because the agency improperly evaluated the past/present performance factor for the proposals submitted by Wallace and BLM. *See* Pl. Mot. at 1; Pl. Memo. at 1-2, 14-15. Second, Wallace argues that the Court should set aside HUD's award decisions because BLM has an organizational conflict of interest that HUD failed to adequately investigate. Pl. Memo. at 13. Finally, Wallace argues that the Court should set aside HUD's award decisions because the agency failed to follow the RFP's stated evaluation criteria in awarding the FSM contracts to BLM. *Id.* at 14-16; *see also* 48 C.F.R. § 52.219-14.

The government and BLM counter that Wallace lacks standing to pursue its claims and that the administrative record in this case demonstrates that HUD's decisions to award the FSM contracts to BLM were reasonable. Def. Mot. at 17-27; Int. Mot. at 7-17; 48 C.F.R. § 52.219-14. For the reasons discussed below, the administrative record shows that HUD's award decisions were both reasonable and in accordance with law. And so, the Court will not set aside the agency's reasonable award decisions.

### A.  Wallace Lacks Standing

As an initial matter, the administrative record demonstrates that Wallace is not an interested party with standing to pursue its claims with respect to the five FSM contracts in dispute in this matter. It is well settled that only an "interested party" has standing to object to the award of a contract before this Court. 28 U.S.C. § 1491(b)(1). In this regard, the United States Court of Appeals for the Federal Circuit has defined the term "interested party" to mean an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed. of Gov. Employees, AFL-CIO*, 258 F.3d at 1302; *see also Rex Servs. Corp.*, 448 F.3d at 1308 (holding that, to have standing, a protestor must demonstrate it had a "substantial chance" of receiving the contract award). And so, to have standing here, Wallace must show that it has a direct economic interest that has been affected by the award of the FSM contracts. *Id.* Wallace can make no such showing here.

In its motion to dismiss, the government argues that Wallace lacks standing with respect to all five of the FSM contracts at issue in this case, because Wallace would not have been the next offeror in line for award if BLM were to be disqualified from receiving the contract awards. Def. Mot. at 17-20. There is ample support for the government's standing argument in the administrative record. AR at 609-10, 630-31, 637-38, 643-44, 672-73.

First, the record evidence shows that Wallace lacks standing to challenge the contract awards for areas 1D, 3P, 4P and 5P. In this regard, Wallace does not dispute that several other offers proposed a lower price for each of these contracts and that Wallace received a rating of "neutral/unknown confidence" for the past/present performance factor for the contracts. *See id.* at 610, 631, 639, 644; *see* Pl. Memo. at 6. The administrative record also demonstrates that at least one offer−other than BLM's offer−outperformed Wallace by both proposing a lower price and receiving a "good/significant" confidence rating for the past/present performance factor for each of these contracts. *See* AR at 610, 631, 639, 644.

Specifically, with respect to the FSM contract for area 1D, there was one technically-acceptable offer that proposed a lower price and received a rating of "good/significant confidence" for the past/present performance factor. *Id.* at 609-10. With respect to the FSM contract for area 3P, one technically-acceptable offer proposed a lower price and received a rating of "good/significant confidence" for the past/present performance factor. *Id.* at 630-31. Similarly, for the contract for area 4P, one technically-acceptable offer proposed a lower price and received a rating of "good/significant confidence" for the past/present performance factor. *Id.* at 638-39. Lastly, for the contract for area 5P, there were two technically-acceptable offers that proposed a lower price and received a rating of "good/significant confidence" for the past/present performance factor. *Id.* at 643-44.[2]

---

[2] Many other offers also proposed a lower price than Wallace. For the contract for area 1D, fifteen other technically-acceptable offers proposed a lower price than Wallace and received either a "fair/some confidence" or "neutral/unknown confidence" rating for the past/present performance factor. *Id.* at 609-10. For the contract for area 3P, five other technically-acceptable offers proposed a lower price than Wallace and received a rating of "fair/some confidence" or "neutral/unknown confidence" for the past/present performance factor. *Id.* at 630-31. For the contract for area 4P, twelve other technically-acceptable offers also proposed a lower price than Wallace and received a "fair/some confidence" or a "neutral/unknown confidence" rating for the past/present performance factor for that contract. *Id.* at 638-39. For the contract for area 5P, nine other technically-acceptable offers proposed a lower price than Wallace and received a "fair/some confidence" or a "neutral/unknown confidence" rating for the past/present performance factor for that contract. *Id.* at 643-44.

Given this undisputed record evidence, Wallace simply would not have been next in line to be awarded any of these contracts if the award to BLM were to be set aside. And so, Wallace does not have a direct economic interest that was affected by the award of these contracts and, thus, lacks standing to pursue its claims.[3] *Am. Fed. of Gov. Employees, AFL-CIO*, 258 F.3d at 1302.

While somewhat less persuasive, the government's argument that Wallace lacks standing to pursue its claims with respect to the FSM contract for area 1P is also supported by the administrative record. In this regard, the administrative record shows that HUD received one offer−other than BLM's offer−that proposed a lower price than Wallace and received a rating of "fair/some confidence" for the past/present performance factor.[4] AR at 673. The administrative record also shows that HUD received eight other offers that proposed a lower price than Wallace and received a "neutral/unknown" confidence rating for the past/present performance factor. *Id*. at 672-73. Given this, the record evidence shows that at least one offer for contract 1P other than BLM's offer outperformed Wallace's offer with respect to both the price and past/present performance factors. *Id*. And so, the evidence in the administrative record demonstrates that Wallace would also have not been next in line for the award of the FSM contract for area 1P. Given this, Wallace also lacks standing to pursue its claims with respect to this contract.

**B.      HUD's Evaluation Of The Past And
          Present Performance Factor Was Reasonable**

Even if Wallace could demonstrate that it has standing to pursue its claims, the administrative record does not support Wallace's argument that HUD improperly rated the past/present performance factor with respect to the proposals submitted by Wallace and BLM. In

---

[3] Wallace's argument that it has standing with respect to the FSM contracts at issue because HUD should have rated Wallace higher for the past/present performance factor with respect to each of these contracts is belied by the record evidence. Pl. Memo. at 12; Pl. Rep. at 4; *see also* Def. Mot. at 18-19. As established below, HUD appropriately and reasonably evaluated Wallace's past and present performance.

[4] The RFP provides for the following ratings for the past/present performance factor: "excellent/high confidence;" "good/significant confidence;" "fair/some confidence;" "unacceptable/low confidence;" and "neutral/unknown confidence." AR at 439. In addition, the RFP provides that the "fair/some confidence" rating for the past/present performance factor means that, "[b]ased on the offeror's recent and relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort." *Id*. By comparison, the RFP further provides that the "neutral/unknown confidence" rating for this factor means that "[n]o recent and relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned." *Id*.

its motion for judgment upon the administrative record, Wallace challenges the rating of the past/performance factor in its proposal upon two grounds.  First, Wallace argues that HUD improperly determined that the past corporate contracts advanced by Wallace to satisfy this factor were not relevant.  Pl. Memo. at 6.  In addition, Wallace contends that HUD violated the terms of the RFP by not considering the key personnel that it also presented to satisfy this factor.  *Id*. at 6-7, 12, 14.

Wallace's arguments regarding HUD's evaluation of the past/present performance factor are belied by the administrative record.  In this regard, the administrative record shows that HUD appropriately considered and rated the past contract efforts proposed by Wallace.  Specifically, the administrative record shows that Wallace identified three prior contracts that it performed to satisfy this factor.  AR at 538-39, 5373-74.  The administrative record also shows that HUD reasonably determined that these three contracts were not relevant to the solicitation either because Wallace failed to provide the volume of properties that it managed under the relevant contracts, or because the scope of work for the contracts was not similar to the FSM contracts.  *Id*. at 5373-74.

The administrative record also shows that HUD complied with the RFP in deciding not to evaluate the key personnel submitted by Wallace to satisfy the past/present performance factor.  *Id*. at 437-38; Def. Mot. at 26.  In this regard, the administrative record shows that, in addition to the three contracts discussed above, Wallace also proposed five key personnel who worked for other field service management contractors to satisfy the past/present performance factor.  AR at 538-44, 5373-74.  Because Wallace provided three recent contracts to support its proposal, HUD did not also consider the key personnel in evaluating the past/present performance factor.  *Id*. at 437; Def. Mot. at 26.

While Wallace contends that HUD violated the RFP by declining to consider its key personnel, a plain reading of the RFP makes clear that HUD had no obligation to consider this information.  In this regard, the RFP provides, in pertinent part, that:

> Offerors or joint venture partners that either have no prior contracts or do not possess relevant corporate Past/Present Performance, but have key personnel with relevant past performance while employed by another company(s), may demonstrate the performance of such key personnel by submitting the names, letter of commitment and summary sheets for three of the most recent and relevant contracts under which such key personnel performed the same role currently being proposed on the instant acquisition.

AR at 427-28, *see also id*. at 438.  In addition, the RFP clearly states, "[f]or any offeror that submit [sic] more than three recent contracts for the offeror/joint venture, key personnel and subcontractors for evaluation, the contracting officer will select only the three recent contracts for evaluation and the other contracts will not be evaluated." *Id*. at 437.  This language shows that while the RFP permitted Wallace and other offerors to submit information about key personnel to satisfy the past/present evaluation factor, the RFP did not *require* HUD to also consider the past work of the key personnel if the agency had already evaluated three prior corporate contracts.  And so, the record evidence demonstrates that HUD appropriately evaluated the past/present performance factor with respect to Wallace's proposal under the RFP.

The record evidence also demonstrates that HUD appropriately evaluated the past/present performance factor with respect to BLM's proposal.  In this regard, the administrative record shows that BLM submitted information about three prior corporate contracts for which BLM previously provided FSM services as a subcontractor to satisfy the past/present performance factor.  *Id*. at 1440-49.  The administrative record also shows that HUD reviewed these prior contracts and determined that BLM "has shown a good history of performance, as well as the capability to manage a project of this magnitude."  *Id*. at 599; *see also id*. at 5435-42; Int. Mot. at 17.  And so, HUD rated BLM's past/present performance factor as "good/significant confidence" for each of the FSM contracts.  AR at 610, 630, 639, 644, 673.

Wallace points to no evidence in the administrative record to show that HUD's determination regarding BLM's past/present performance rating was improper.  *See generally* Pl. Memo.; Pl. Rep.  Rather, the record evidence supports the agency's finding that BLM would successfully perform the FSM contracts.  *See*, *e.g*., AR at 599, 607, 5434, 5436-38.  And so, HUD's decision to rate BLM's past/present performance factor as "good/significant confidence" was reasonable and in accordance with the requirements of the RFP.

### C.     The Administrative Record Does Not Support Wallace's Organizational Conflict Of Interest Claim

Wallace's argument that the Court should set aside the contract awards here, because BLM has an unresolved organizational conflict of interest that HUD failed to properly investigate, is also contradicted by the record evidence.  The United States Court of Appeals for the Federal Circuit has held that the Federal Acquisition Regulation ("FAR") only obligates an agency to conduct an organizational conflict of interest analysis for significant conflicts.  *PAI Corp. v. United States*, 614

F.3d 1347, 1352 (Fed. Cir. 2010) (holding that agencies are only required to document "significant potential conflicts" and that protestors must identify "hard facts" showing an organizational conflict of interest); 48 C.F.R. § 9.504(a)(2).  In this regard, contracting officers are given broad discretion in determining whether the potential conflict of interest is significant.  *Id.*

In its motion for judgment upon the administrative record, Wallace argues that BLM has an organizational conflict of interest that HUD failed to adequately investigate in this matter, because BLM performed pre-conveyance work in locations covered by the contracts for areas 3P and 5P. Pl. Memo. at 7.  To support this claim, Wallace has submitted an affidavit of its President, Kevin Wallace, which states, in pertinent part, that:

> While [Wallace] was preparing its proposal in response to the Solicitation I was approached by Brent Martin, the owner of BLM Companies, LLC ("BLM") offering to provide me with inspection services on Bank owned homes in Eastern Pennsylvania. In our discussion, Mr. Martin stated that he provided inspection services for the incumbent HUD FSM contractor Innotion Enterprises, Inc. as well as two other companies one named Safeguard and the other called Sentinel Field Services.
>
> I have personal knowledge that Safeguard provides pre-conveyance services in Pennsylvania for homes mortgaged by Freddie Mae [sic] and Fannie Mac [sic] which are not HUD's Federal Housing Administration ("FHA").  The services described as creating a conflict interest in the Solicitation.  Sentinal was doing Freddie Mac and other pre-conveyance work in Pennsylvania.

Pl. Memo. at 13; Pl. Rep. at Ex. A.[5]

But, there is no evidence in the administrative record to support Wallace's claim that BLM has an organizational conflict of interest or that BLM performed any pre-conveyance work in the relevant areas.  *See* AR at 686-87, 691-96, 729, 5825-33.  Rather, the administrative record shows that HUD conducted a reasonable investigation into whether BLM had performed pre-conveyance work and that the agency did not find any evidence that BLM performed pre-conveyance work in any of the areas for which BLM had been awarded a contract.  *Id*. at 691-96, 729.

Specifically, in a memorandum for the file dated October 9, 2015, Craig Karnes, the Principal Administrative Contracting Officer, states that he sought information about BLM's potential pre-conveyance work in area 3P from BLM and also consulted HUD employees regarding

---

[5] In its motion for judgment upon the administrative record, BLM does not deny that the meeting referenced in the affidavit occurred.  *See generally* Int. Mot.  But, BLM states that it "has not and is not performing any of these activities in Area 3P or 5P."  Int. Mot. at n.4; *see also* AR at 686-87, 691-96, 5825-33.

the existence of any pre-conveyance work in any of the other areas for which BLM had been awarded a contract. *Id*. at 729; *see also* Int. Mot. at 12. The administrative record also demonstrates that HUD concluded that there was no evidence to indicate that BLM performed any past or present pre-conveyance work that would give rise to an organizational conflict of interest. AR at 691-96, 729; *see also* Int. Mot. at 13. Given the absence of any evidence in the administrative record to demonstrate that BLM has performed pre-conveyance work in the relevant areas, the record evidence shows that HUD appropriately investigated the alleged organizational conflict involving BLM and reasonably concluded that there was no evidence to indicate the existence of a significant organizational conflict of interest.

### D.        The Record Demonstrates That HUD's Award Decisions Were Lawful

Lastly, the administrative record does not support Wallace's remaining claim that HUD failed to follow the RFP's evaluation criteria in awarding the FSM contracts to BLM. *See* Pl. Memo. at 14-16. Specifically, Wallace alleges that HUD violated the RFP's evaluation criteria by (1) failing to adequately address the alleged organizational conflict of interest involving BLM; (2) improperly evaluating BLM's past and present performance; and (3) disregarding BLM's alleged overreliance upon large business subcontractors to perform the FSM contracts. *Id*. at 1, 13-16.

As demonstrated above, Wallace's first two challenges are simply not supported by the record evidence. The administrative record shows that HUD appropriately evaluated BLM's past/present performance factor in a manner that is consistent with the RFP. AR at 599, 607, 5434, 5436-38. The administrative record further shows that the agency reasonably determined that BLM did not have an organizational conflict of interest. *Id*. at 691-96, 729.

Wallace's final challenge to HUD's award decisions−that HUD failed to comply with the RFP's requirement that the contract awards in this matter would be small business set-asides−is also not supported by the record evidence. *Id.* at 373, 419-20; *see also* 48 C.F.R. § 52.219-14 (prime contractors must expend at least 50 percent of the cost of contract performance on its own employees). In this regard, Wallace argues that HUD improperly disregarded evidence that BLM intended to rely too heavily on the work of subcontractors to perform the FSM contracts, in violation of the RFP and the FAR. Pl. Memo. at 15-16; 48 C.F.R. § 52.219-14. To substantiate this claim, Wallace points to BLM's proposal for the FSM contracts which states, in pertinent part, that "[BLM] has grown to 37 full-time staff members and over 300 vetted contractors." AR at 1390,

1416. But, nothing in this statement demonstrates that BLM will rely too heavily upon subcontractors to perform the work called for under the FSM contracts. Rather, the administrative record clearly demonstrates that BLM committed in its proposals to ensure that "[a]t least 50 percent of the cost of contract performance incurred for personnel [would] be expended" on BLM employees, as required by the FAR and the RFP. 48 C.F.R. § 52.219-14; Int. Rep. at 3-4.

Given this, the record evidence simply does not support Wallace's claim that the award of the FSM contracts to BLM was unlawful. And so, Wallace cannot prevail upon this final challenge to the agency's award decision.[6]

## V.    CONCLUSION

In sum, the administrative record for this matter demonstrates that Wallace lacks standing to challenge the contract awards in dispute in this case, because, if BLM were eliminated from the competition, Wallace would not be next in line to receive any of the disputed contract awards. In addition, even if Wallace could demonstrate that it has standing to pursue its claims, the administrative record also clearly shows that HUD acted reasonably and in accordance with applicable law in deciding to award the FSM contracts to BLM.

And so, for the foregoing reasons, the Court:

1.    **DENIES** Wallace's motion for judgment upon the administrative record;

2.    **GRANTS** the government's motion to dismiss or, in the alternative, cross-motion for judgment upon the administrative record; and

3.    **GRANTS** BLM's motion for judgment upon the administrative record.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the Protective Order entered in this matter on December 17, 2015. This Memorandum Opinion and Order shall therefore be filed under seal. The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any

---

[6] Wallace filed a motion for preliminary injunction during the early stages of this bid protest litigation requesting that the Court enjoin BLM from performing under the subject FSM contracts. To the extent that Wallace now seeks permanent injunctive relief, such relief would not be available because Wallace has not succeeded upon the merits of its claims. *Cf. Blue & Gold Fleet, LP. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007); *see Argencord Mach. & Euip., Inc. v. United States*, 68 Fed. Cl. 167, 176 (2005) ("A plaintiff that has not actually succeeded on the merits of its claim cannot prevail on its motion for injunctive relief.").

information should be redacted in accordance with the terms of the Protective Order prior to publication.

The Court hereby **ORDERS** that the parties **FILE** a joint status report, on or before **Friday, May 27, 2016**, identifying the information, if any, that they contend should be redacted in this Memorandum Opinion and Order, together with an explanation of the basis for each proposed redaction.

The Clerk is directed to enter judgment accordingly.

Each party to bear its own costs.

**IT IS SO ORDERED**.

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge